Good afternoon, Judge Fletcher. May it please the Court. My name is John Eastman with the Claremont Institute Center for Constitutional Jurisprudence and also a professor at Chapman University School of Law. I want to acknowledge co-counsel Steve Imhoff at the table and also my students at Chapman that have been working with me on this case, one of whom made the drive up here with us, Amy Duncan, who's here with me as well. And I'd like to reserve five minutes for rebuttal, if I may. In 1994 and 1996, the people of Nevada overwhelmingly voted to amend their Constitution, passing by more than 70% of the vote both times, imposing a two-thirds vote requirement on their state legislature whenever it sought to raise taxes. Last February, Governor Gwinn proposed nearly $1 billion in new taxes. By May, it was pretty clear that there was not two-thirds support for such a massive tax increase. According to the state financial officer, the state had roughly $4 billion in revenues that it could expend for the two-year biennium budget. That's significantly larger than the last budget had been. It wanted to increase spending and other programs. But instead of funding all of the programs at a proportionate increase, it passed first a general appropriation bill of nearly $3.3 billion, a whopping 35% larger than the prior budget, more than double the rate of population growth and inflation growth combined. And they did this on the very last day of the session. That left roughly $700 million remaining for the entire education budget of the state. And predictions were that that was going to be in the neighborhood of $1.6 billion. And then they closed session, and their statutes are constitutionally limited to a 120-day legislative session. They then went out of session without funding a single dime for education. The governor then called them back into special session, but by proclamation, he limited their new session only to tax increases to fund the necessary education bill. In other words, we've created a grand ruse here to get around the two-thirds vote provision that had been imposed by the voters of the state of Nevada. That's an interesting conclusion, but all the governor is doing is exercising his constitutional power to call a special session. A grand ruse? Well, you know, when you're talking about a budget conflict, and he has perfectly within his power to open up the special session to consider the entirety of the budget, rather than accepting a 35% increase and then say, hey, we don't have enough money left to fund education, I think that's a ruse. He said several times, the legislature never asked me to open it up more broadly. It seems to me that we would be served, if you directed your attention at at least two or three things. One is, is there still a live case? Two is, what is the injury to anybody from a bill that passed one house of a legislature and never became law? And the third is, I'm now forgetting it. Rooker-Feldman, I think. No, not Rooker-Feldman, because I'm not sure, unless you get over the first two, I don't know why we get to Rooker-Feldman. Okay. Let me take up the mootness issue first, and there are several points. One is, the unconstitutional action diluting the legislator's votes already occurred. When the assembly passed — That seems extremely abstract and non-meaningful, because does anybody have an interest in a vote that doesn't result in anything that is operational in any sense at all? I'm not saying that whether their vote mattered, but nothing operational ever occurred. Well, in fact, it is operational. You have to have, according to the Nevada Constitution, a valid vote on the bill at each step of the process. You can't just at the end of the day tally up the votes and say, well, we got two-thirds with a little bit here and a little bit there. Every step of the process, and the Nevada Constitution specifically distinguishes between votes for bills, which required a two-third vote for every vote for a bill,  and votes for bills that required a two-third vote for a bill. But people are bringing constitutional lawsuits on every motion that passes or fails or every amendment that passes or fails. No, I think only — Well, what's the difference between that and getting through one house of the legislature in a bicameral legislature — Well — — without a governor's signing the bill? You know, I mean, part of the point of this lawsuit is, in fact, that's just the problem. If we can so cavalierly disregard this two-thirds vote provision — No, no, no. I'm not talking about disregarding a two-thirds vote provision. I'm asking what the injury is from a not — something that never was operational in any sense, whatever. I think any time a vote is diluted, you don't need to ask whether the vote produced the outcome the voter wanted in order to have a constitutional injury. Let's look at the presidential — What's the injury? The injury is the vote was diluted. They deemed — But the vote didn't amount to anything.  But it never became law. It never became law. It never cost the people of the state of Nevada one farthing in the English system. I will — So what? I will concede, as I did in the briefs, that one of the claims we had, which was the due process for raising taxes without complying — this was on behalf of the property owners — that the anticipatory claim that you've raised taxes without due process of law never ripened because none of these votes ever gave rise to that harm. But there are other harms. The D.C. Circuit in Mitchell v. Anderson recognized as a harm both for the legislators and for their constituents. When the vote itself was altered, when they changed the dynamic, when they changed the number of votes necessary to pass a bill, and they didn't take the next inquiry on whether the bill actually ended up getting signed and becoming law, the vote dilution that occurred at the vote itself was sufficient to raise the constitutional harm. Did the vote become law? Pardon? Did the vote become law? No, it did not. I think we're all after the same thing. We end up with SB 8 that's passed in full compliance with the two-thirds requirement. That's correct. So any taxing system that Nevada ends up with, you don't — you don't object to on constitutional grounds. I have a minor objection to that, and — which is, as the legislature acknowledged in one of the briefs they filed in the Nevada Supreme Court, the Nevada Supreme Court's decision altered the legislative dynamic. The testimony by Senator Mar — or by Assemblyman Marvel that he felt pressured in order to avoid the constitutional crisis to cast the vote he would not otherwise cast. The harm that the D.C. Circuit talks about in Mitchell is precisely that harm, the altering of the legislative dynamic that occurs with a vote dilution. So — so I — you know, it's minor, but I'm not willing to give it up entirely because I think that goes to the issue both of what happened already and what's likely to happen starting next year on the next legislative session. The Nevada Supreme Court in Gwynne described the current situation in Nevada as follows. Article 4, Section 18.2 of our Constitution now requires a two-thirds vote of each house, quote, to pass a bill or joint resolution which creates, generates, and so forth. Do you agree with that summary description of what the system is in Nevada? It — it — it requires a two-thirds vote not just to pick among taxes but to raise taxes at all. It requires a two-third vote of each house to pass a bill. Yes. They said, okay. Now, they didn't say that you can have a majority vote in one house and a two-thirds in the other and that's okay. They acknowledged what the system required. That's right. And you haven't gotten that here. That's right. Right. But you never did get anything under the bad system. You didn't get a majority vote in both houses in contravention of the Constitution. We had a two-thirds vote in the Senate. We had a simple majority vote in the Assembly. And that bill was nevertheless deemed as passed. Passed by the Assembly, but not passed by the legislature. But if you track through the language of the Nevada Constitution, it's just, I just don't have to have two-thirds at the end of the day. Every bill has to have two-thirds vote in each house. But that's not the operative bill. So the bill is — Well, no. The constitutional violation occurred both with SB 5 and SB 6. On another day, on another bill — Neither SB 5 or SB 6 ever became law. It didn't become law. All right. That's right. All right. Now why do we have a live controversy here? Well, again, the action that violated the right to vote of legislature already occurred. But second, let's assume that's not sufficient. The legislature voluntarily stopped acting in violation of the two-thirds provision when it adopted SB 8 with a two-thirds vote. Voluntary cessation doesn't moot a case unless there's no reasonable view that they would be likely to do this again. Well, but typically, the voluntary cessation doctrine to save from mootness is they know that the hammer's coming down on them, so they quit temporarily. And as soon as the hammer disappears, they're going to do it again. I'm not sure this case fits within that paradigm. Well, I'm not so sure that it doesn't. You know, the hammer was a TRO issued by the Senate. The hammer was the public opposition to what they were doing. The TRO was lifted, and the first thing the Assembly did was pass out another bill by simple majority rule. Now, granted, when it was sent over to the Senate, the Senate said, we're not touching this thing. So at least one house of the Nevada legislature recognized the problem with this. But part of your problem is another one which does touch on Rooker Feldman. Part of your problem is that, at least for a short time, the Nevada Supreme Court seemed to say that as between the choice of funding education and as on the one side and on the other passing by two-thirds, the Nevada Supreme Court said, oh, well, if you're between a rock and a hard spot that way, education wins. Well, the Nevada Supreme Court seems to have turned that into a ticket for this day and train only by its subsequent opinion. You know, I don't think either the initial opinion or the subsequent opinion made it for this day and train only. The mandamus was issued to the legislature acting in the ruling in that case is that any time there's a conflict with your ability to fund education and the need to raise taxes, the two-thirds tax provision has to give way. That holding is certainly binding precedent in a going-forward basis in Nevada unless it is so far outside the realm of legitimate interpretation that it ought not to be acknowledged. And I think that's what the Senate did on Saturday night when it refused to consider the SB 5 that had been sent over from the Assembly because it didn't pass the two-thirds vote. And let me go through the education provisions and talk about the supposed conflict. My third point, which I didn't make before, your next big problem is that the Gwynn case tells us what Nevada law is, right? So I don't understand how your constitutional provisions of arguments, if we ever got to them, don't rest on asking us to disagree with the Nevada Supreme Court about Nevada law. Well, you know, there have been a few instances where the federal courts, including the U.S. Supreme Court, have refused to accept state court interpretation of state law. I cite Bush v. Gore in my brief. Another one that's also relevant, although older, it goes back to the Civil Rights era, South Carolina Supreme Court in dealing with a lunch counter trespass case, Bowie v. City of Charleston. The state statute said, you know, it's a trespass if you go onto someone else's land without permission. There was no whites only sign in the particular lunch counter. They went in, they took up seats and asked to be served and were refused and then were asked to leave. And when they refused, they were arrested for trespass. And the Nevada Supreme Court... Those cases, and I'm not here sort of saying yes or no, good cases, bad cases. I'm just trying to characterize them. All of those cases, including Bush v. Gore, come, it seems to me, from the United States Supreme Court's deep suspicion that the state courts in those instances were finding things as a matter of state law in order to avoid what the Supreme Court thought was the fairly clear command of federal law. That is to say, they were basically premised, I'll say it bluntly, on a suspicion by the United States Supreme Court of bad faith by those state courts. Right. And I think the same... I don't see that here. Well, I think the same holds true here. I mean, you cannot go through the litany of what transpired here and not think there's bad faith from a number of the players. The decision to zero-fund education to create this crisis, the refusal of the governor to... But is the bad faith a bad faith? Let's assume there's bad faith. I don't know what you call bad faith. There was what you are characterizing as bad faith. But whatever it was, were they attempting to avoid a constitutional right or they were just attempting to get the State operating in some way that it could go forward? Well, you know, they had a problem balancing the budget because some of the legislatures didn't want a billion-dollar tax increase. In other words, the bad faith to which Judge Fletcher was referring in those cases was bad faith with regard to federal law. Yes, I think so, because I think the voting rights that are protected here, the weight of a legislator's vote that is given by the people of the State of Nevada, it's the State Constitution sets the baseline on what that weighted vote is. And they said you can't raise taxes without a two-thirds vote. And to diminish the weight of that vote is to violate federally guaranteed voting rights. It is also, and I'll bring it up here, it is also to violate the most basic precept of the Republican guarantee of government. Now, you know, Justice O'Connor in New York v. United States, in denying the Republican Guarantee Clause claim there and acknowledging that we haven't recognized these as justiciable for 150 years, said there may well be cases when these things ought to be justiciable, such as when government officials are altering the form and method of the state's structural constitution. That's exactly what went on here. They took a clear mandate of the people. You don't raise taxes without a two-thirds vote. And they said some vague educational funding provision, it's just the support education that was enacted in 1889 prevails over this most recently enacted structural requirement as an impediment to the state legislature. I mean, you know, to end run the will of the people that way with ignoring the fundamental canons of construction, the more recent prevails over the older, the more specific and the two-thirds requirement is much more specific than anything in the education clauses. You know, you go down the litany, the governor coming with unclean hands when he had it in his power to resolve this by just broadening the scope of the proclamation. All of those things were ignored by the Nevada Supreme Court. And I think that gets you to bad faith in what is essentially an attempt to just void the impact of a duly enacted constitutional provision. They didn't just interpret it as an emergency exception. And they didn't just find it unconstitutional under some federal provision. No, with our case in Bennett v. Yoshino. What's that? Bennett v. Yoshino. Yes. Were you familiar with that? Wasn't the problem there somewhat similar as portrayed by the plaintiffs? That is, that the claim was that the Hawaii Supreme Court had simply trampled on the Hawaii Constitution. And our conclusion was essentially, don't make a dent. Well, you know, I had a due process claim that in the process that the Nevada Supreme Court undertook, all of these things about violating their own canons of construction, that's not at issue in this case. We have no such due process claim here. So you think that Bennett would have prevailed if they had turned it into a vote dilution claim? Well, you know, I think they might have if they bring it over in federal court. It certainly gets over the Rooker-Feldman problem because they're not directly challenging as a violation of due process the state court's own judgment. They are going after action by other actors in the government violating the state constitutional provision that diluted the vote of the legislators and their constituents and basically wiped out a constitutional provision, even though they say it's still on the books. I don't know what it means if it can't be enforced in precisely the instance when it was designed to be enforced, when the option is we've got too much that we want to spend for what the existing revenues are. The ballot, the ballot. I mean, to go back to the beginning. I noticed my time was up. I want to. Yeah, but. Are you trying to save? I asked for five minutes. I didn't. Yeah, we're running into that, but let's go back and forth. Why don't you go ahead? We'll deal with it later. I didn't mean to cut you off. That's all right. I will save you some time. Okay. And we'll now hear from the Nevada State Senate. Your Honor, members of the court, Jeff Parker, Solicitor General of the Attorney General's on behalf of Governor Gwynn of the State of Nevada, Dean Heller, Secretary of State of the State of Nevada, and Defendant Charles Chinook, Executive Director of the Department of Taxation of the State of Nevada. Initially, I just want to say, in light of what's gone on immediately before, is that I believe the court's implications are correct. Now, before we get into this, are you wanting to share argument with co-counsel? Yes, I am. Thank you, Your Honor. How would you like to divide that time? I must split this with me giving ten minutes and co-counsel for legislature ten minutes. I must do that because he's my bar president. Okay. Ten minutes it is. We'll save you. Is that a capital B? And a P. Okay. In the words of a movie I recently saw was a lament of one of the characters who was called to work on his days off, and every time something happened, he was a convenience store clerk, every time something bad happened, he said, we're not even supposed to be here. Members of the court, we're not even supposed to be here. This case is moot. On July 21st, 2003, when both houses of the Nevada legislature signed SB 8 into law, this case went away. It was enrolled the next day by the Secretary's Isn't there a nominal damages claim? No nominal damages claim. There is no nominal damages claim? There is none. There was never any injury, and that is best addressed in Does they make a nominal damages claim? I think that's the question. Do the plaintiffs make a claim for nominal damages for what happened to SB 5 and SB 6? They seek damages in their complaint. I don't believe, I think they're claiming nominal damages now, but I don't think their complaint claimed nominal damages. Their complaint, pardon me, they do. It says for nominal damages of $1 each defendant, excuse me. So the court is correct. So does that mean that we have to reach something other than mootness in order to dispose of this case? Well, we don't think a nominal damage claim has been established for the very But we do have to reach something other than mootness, and we have to decide whether their nominal damages claim has been established. That's correct. And that would be the best way to address that claim was addressed in co-defendant's brief with regard to ripeness. And as the court said, the assembly passing SB 6 in this case never affected anyone. No one paid anything. It had no legal effect. It was nothing more than, as the Supreme Court said in the Raines case, an artificial, an abstract dilution of legislative power for AB 6 to have effectuated any kind of damages. Even if to obtain nominal damages, something would have had to have been passed in effect and then perhaps stopped so that there was a wrong. Here there was no legally cognizable wrong. And the analogy It's not exactly a ripeness argument. It's just no legal wrong. That's correct. It didn't There's not going to be a better one next week. There just isn't one. There just isn't one. That's correct. And the Raines case analogy, or the Raines case was, you have to have enough people to have passed the law or resisted the law and the law had to actually pass. And that same analogy applies to every one of their claims. The law in this case, SB 8, never passed. Who was hurt? Who was at jeopardy? I mean, it may have made sense at one time for plaintiffs to see, look, this thing is going in a way that we think is unconstitutional for right or wrong, and seek injunctive relief at the time the Assembly acted with SB 6. Yeah, I think I've got the drift of this argument, but there's one thing that I've been sort of having trouble with, and that is, can you save a case that would otherwise be moot by the device of asking for nominal damages? I mean, is the request for nominal damages enough to save a case for mootness? A case that otherwise goes moot because there's no harm been suffered and any relief you ever would have wanted, except for the nominal damages, has been given you by the operation of some external event? I think, well, it's our belief that to get to the point of nominal damages, you have to have a legally cognizable wrong, at least. And this doesn't get to that point. There's no legally cognizable wrong that could cause damages, but didn't, and in which case nominal damages would be affordable. And your argument is that you don't get to that point because SB 6 was never passed in the federal law? That's correct. SB 6 never affected anyone. The hypothetical that you're talking about where nominal damages might be applicable is SB 6 passed, the Senate agreed with it and passed it. And at that point, this case stopped and was brought to federal court and stayed, perhaps, and not a tax was rendered, no revenue was raised, no one technically lost any money, but they had a legally cognizable harm and therefore entitled to nominal damages. It didn't get to that point here. And we agree with the court. We discussed this in preparing for this matter beforehand. You know what the case was. But just to be clear, exactly what happened here was that the case, the SB 6 passed the Senate by a two-thirds vote. Am I right about this? Passed one of the houses by a two-thirds vote, the Senate originally. That's not correct. Never passed? SB 6 passed the assembly by less than a two-thirds vote. And I thought it also had passed in a different version, the Senate in a two-thirds vote, no? No, that's not correct. No? What happened is, following the litigation, beginning of the litigation, the assembly Otherwise, this bill, SB 6, only passed the assembly and by less than a two-thirds vote. Correct. It never passed the Senate at all. That's correct. I thought I saw otherwise, but okay. I don't know, you know, Nevada does things differently, I suppose, but I thought That's an understatement. I thought when a piece of paper got a name on it and it says Senate bill or assembly bill, that it doesn't get to the other house until the originating house has acted on it. That's, they go back and forth and too bad I don't have my wife here because she's an expert on legislative process. But a case can start anywhere. The SB designation doesn't have anything to do with the final outcome. It could have just been a case originally proposed in the Senate. It could have been referred to an assembly committee. So that doesn't mean it passed the House or the Senate in order to get this? It doesn't mean that. It doesn't mean that. Okay. I wasn't casting aspersions on Nevada, by the way. So are you essentially abandoning the Rooker-Feldman argument as unnecessary at this point? No, I'm not. I'm prepared to address it. I just noted the court was Well, it seems to me you've been caught up in the rest of it because if there is, the Rooker-Feldman doctrine depends upon there being a court judgment to be interfered with. If the court judgment is no longer operative because it was an order with regard to SB6 in a particular context and that didn't happen, there's really no judgment to be interfered with. Their complaint is about the decision of the Nevada Supreme Court, its result, but not its judgment. And I wouldn't think that Rooker-Feldman would apply in those circumstances. I don't think it matters, but I don't think Rooker-Feldman would apply when all we have left is either a moot or non-moot case, but it's about the potential future impact of an opinion, not really a judgment. We would agree. We would not disagree with the court in that regard. And to go further, we don't even think the future effect of the judgment is in question by virtue of the Supreme Court's decision on rehearing. The Supreme Court said specifically this applied only in the 20th session, and if taxes were to be raised in the future, that would be subject to review. That's clear. Does anyone know what my time is? I'm beholden to Mr. Flanagan. Well, you can use another 1 minute and 16 seconds and still keep your job. Thank you very much. We agree. We're not even supposed to be here. The claims are moot. Nonetheless, in summary, we don't think the Rooker-Feldman doctrine applies. The most helpful case in this regard is this Court's decision in the Noll case, which expressly said, you know what we tried to do in the Noll case? We tried to go through and list the history of Rooker-Feldman, that it started as something that was pretty small and a negative. You know what? We've read the Noll case. Some of it more than others. You may want to save your time for Mr. Flanagan. I will do that. But we believe if the case is not moot, we believe that plaintiffs are out on Rooker-Feldman, and in addition, Your Honor, we believe that the 12B6 dismissal of the non-legislative claims was proper because the Nevada Supreme Court is the final arbiter of the laws of the State of Nevada until it's overturned, and that is binding on Federal courts as well. Thank you. Okay. Thank you. Mr. Flanagan, do you wish to argue from there? What's going to work best for you? It's up to you, Your Honor. Whatever works best for you. Did they give you a mic that you can use? They have, Your Honor. I don't know if it's necessary. Can you hear me from here? No, the mic is useful because then it works under the tape recording system. Well, if you'll just give me a minute. It can take as long as you need. I want you to just move the microphone over here. That'll work fine. Can you hear me now? Where have I heard that before? Okay. Thank you, Judge Fletcher, and although my esteemed co-counsel may wonder why he's here, I want to express my thanks to Stanford Law School for opening up its facilities here and allowing the arguments to be held in front of bright, bright, very bright future lawyers here. Your Honor, if I could just answer a few of your questions. Judge Berzon, the reason the Rooker-Feldman Doctrine was even addressed by the district court below was because at the time. No, I understand that. I'm just asking whether it's basically self-guided. Yes. Even if the case isn't moved. I mean, it just seems to me that it's just out because we don't have any judgment, an operative judgment to be interfered with. That's correct. That's correct. And, Judge Nelson, you know, the process was the Nevada Supreme Court's decision, and Gwen came down on July 10th. On July 13th, Sunday, SB 6 was considered by the Nevada Assembly and passed by a simple majority vote. The voluntary secession argument, Judge Fletcher, doesn't apply in this case. There was no unconstitutional or illegal conduct at the time. And even after the case was dismissed, SB 5 was passed by a simple majority vote. Thus, this conduct wasn't stopped because of the instant litigation. It went on in spite of it. And as this Court well noted, SB 8 was passed by both houses on a two-thirds majority, rendering the issue here moot. And I believe that really is the nub of the case. But fundamental to this case, Judge, is the interplay, the respect that the federal courts must have for the interpretation of the Nevada Constitution  Judicial integrity depends upon the respect that federal courts give to state court judgments. In spite of the appellant's contingency to the contrary, whether you can defend the Gwen decision, whether you like it, whether it's right or wrong, it is the definitive interpretation of the Nevada Constitution by the Nevada Supreme Court. And indeed, as the legislature, we could do nothing but follow the Constitution as interpreted by our state's highest court. In fact, if we were to follow appellant's arguments, we would have, by some measure, would have been forced to ignore a specific Supreme Court interpretation of the Nevada Constitution directed at the legislature to conduct its business pursuant to the state's Constitution. And we had no other alternative but to follow the state Supreme Court in this regard. There was, I have to make one comment, Your Honor. The charge that the governor of the state of Nevada acted in bad faith, or if there is some sort of ruse to be pulled over the eyes of the citizens, is a serious charge, the basis of which is not found in the record before this Court, and I would reject it outright. I was taught if you were to give a speech, be brief, be sincere, and be seated. Your Honors, if you have no further questions, I have nothing further for this Court. Thank you very much. No further questions? Okay. And you've saved some time. Let me go back to the nominal damages claim. We certainly raised one. Let me give a hypothetical. Law professors like to do that. What if, instead of just ruling by majority vote and deeming SB 5 and SB 6 as passed, they had barred a certain proportion of the legislators from voting at all? And SB 5 and SB 6 never make it all the way to the statute books. There's no tax imposed down the road. My taxpayer businesses plaintiffs don't have a claim because that never ripened. But there is clearly a deprivation of the right to vote constitutionally guaranteed under the 14th Amendment of the U.S. Constitution. The citizens that decide what weight those votes have, whether zero ---- The right to vote of a legislator is the right to have his vote properly counted with regard to the result of the legislative process, not simply to go around pushing buttons and voting. And if the so-called deprivation of the right to vote doesn't result in anything at all that comes out of the other end, there's no sausage there, then I'm having a hard time seeing the injury. Well, we described the process. Both of these bills were first introduced in the Senate. They passed by two-thirds vote in the Senate, and they were forwarded over to the House. Until the House or the Assembly gets two-thirds vote, it doesn't get forwarded back to the Senate for the affixing of signatures. It passed the Senate first. They both passed the Senate first by two-thirds vote. That's what I thought. Yeah. In the 20th special session. And it went to the Assembly. And it failed several times to get the two-thirds vote. But the bills were different, and it would have had to go back to the Senate. There was an amendment made to SB 6, and it had to go back to the Senate. And the Senate was considering whether to accept the amendment when the TRO came down. But the point of this, and, you know, and again, I encourage you to go to the Nevada Constitution and track the language. There is different clauses that refer to bills as opposed to laws that come out at the end of the process. And the two-thirds requirement specifically applies to every bill. I'm trying my best not to look at the Nevada Constitution. That is, we decide questions of federal law, not questions of Nevada law. But when we're talking about what the people of Nevada have set as the baseline for the right to vote on these legislative bills, and if that right to vote is diluted, that violates federal law. How can that possibly be? That is to say, there are certain federal rights, I understand. But if Nevada chooses to count the votes one way today and chooses to count the votes one way tomorrow, that's entirely a matter of Nevada law. If they say, for example, today it's going to take you 50 percent to pass a tax measure. They pass a referendum. It says two-thirds. The next week they pass another referendum. It'll go back to one-half. That's no concern of the federal government. Well, it is when, in fact, that process occurred. It used to be 50 percent. Then the voters said it's now two-thirds. And the state court and the state officials have said we're not going to comply with the two-thirds. My clients asked me after this was all over, we want to do a new initiative. What should we say? I said, what are you going to write it as? This time we mean it. I mean, how does the federal right that's implicated here is the right of the Nevada citizens to decide what that question is going to be, whether 50 percent or two-thirds? We're going to have everybody and their brother running in here every time the California, Nevada, or Arizona Supreme Courts decide to construe a statute or a constitutional provision in some fashion that they believe is contrary to what was intended to begin with. Where's the stuff? No, I think you can do it when you're in the – I think you can do it in exactly the terms that the Supreme Court has said when it is so far beyond the realm of reasonable interpretation. They took this two-thirds provision recently enacted and gave a 130-year-old provision precedent. They took a very specific – Let me interrupt here just to give you a timing heads up. Mr. Flanagan ceded some of his time. You're now over. I'll give you one minute of Mr. Flanagan's time and then we're finished. Sure. You know, I think what we've got here is the ability of the citizens of Nevada to do what they did, which is to alter their constitution, to alter the forms and particularly the methods of how the legislature would enact taxes for the state of Nevada. Justice O'Connor tells us those things may well raise a Republican Guarantee Clause claim. The people here are asking that this federal court step in as the structural referee – that's the Four Circuit's language in Broncala – the structural referee to protect the people in their structural decisions against the officers of the state government that would undermine those structural decisions of the people. Whether we call it Republican Guarantee Clause or we call it vote dilution claims, those are all federal rights that were violated when the assembly said, we're going to ignore your structural mandate that we don't waste taxes without a two-thirds provision. We did it twice and the Nevada Supreme Court in its September 17th decision said, it is a certainty that every time we're going to fund education from now on, it's going to require tax increases and it's going to create the conflict. So that provision is now gone from the state constitution. Thank you, Your Honor. Thank you very much. I thank both sides for a helpful argument. The case of Amidai v. Nevada State Senate is now submitted for decision. And we are now in adjournment from our formal session. I know we have students here and we're willing to stay after and postpone our conference in case students want to ask questions about – sort of general questions about oral argument and various things. If you want to ask questions that you fear might be treading a little bit like an improper question, don't worry. We can take care of ourselves and not answer the question.
judges: T.G.nelson, W.fletcher, M. Berzon